In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-18-00050-CV**
_____

**IN THE INTEREST OF H.D.M. AND J.D.B.**

**On Appeal from the County Court at Law**
**Polk County, Texas**
**Trial Cause No. PC06721**

**MEMORANDUM OPINION**

After a bench trial, the trial court entered an order terminating Appellant L.G.'s parental rights to her minor children H.D.M. and J.D.B.[1] At the time of trial, H.D.M. was eight years old and J.D.B. was seven years old. L.G. appeals the termination order, and in a single issue, she challenges the sufficiency of the evidence to support a finding that termination of her parental rights is in the best interest of her children. We affirm.

---

[1] We use initials to protect the identity of the children. *See* Tex. R. App. P. 9.8. Other persons are identified, as necessary, with initials or designations based on their respective relationship with the children and role in this case. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2017); Tex. R. App. P. 9.8.

1

Procedural Background

On October 6, 2016, the Department of Family and Protective Services (the "Department") filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship ("the petition"). The petition named L.G. as the mother and J.B. as the father of H.D.M., who was seven years old, and of J.D.B., who was six years old.[2] In the petition, the Department requested that the trial court appoint the Department as the children's temporary managing conservator because "continuation of the children in the home would be contrary to the children's welfare[.]" The petition also requested that the trial court appoint the Department as the children's permanent sole managing conservator if the children could not be reunified with either parent or permanently placed with a relative or other suitable person for placement, and that L.G.'s and J.B.'s parental rights be terminated if reunification could not be achieved.

The petition was supported by a sworn and notarized affidavit of a Department representative, describing the circumstances necessitating removal. According to the affidavit, the Department received a report on October 5, 2016, that adults at the home were being arrested for methamphetamines found in the home and that the

---

[2] J.B., the children's father, is not a party to this appeal, and we discuss him herein only as necessary to our disposition.

drugs had possibly been used in the children's presence. L.G. had admitted to recent meth use in the home, and no other family members were available or willing to care for the children. The affidavit alleged that L.G. had a prior history with CPS, including allegations of neglectful supervision. The affidavit also alleged that J.B. had a criminal history, which included numerous convictions.

After a status hearing on December 20, 2016, the trial court entered an order requiring the parents to complete a service plan, requiring that visitation between the parents and the children be supervised, and setting a date for a permanency hearing. L.G.'s service plan required her to, among other things, complete a psychosocial evaluation, maintain safe housing for the family, complete a drug assessment, complete parenting classes, participate in random drug testing, attend individual counseling, and maintain contact with her caseworker.

After a bench trial, the trial court signed a final order of termination on February 2, 2018, naming the Department as permanent managing conservator of the children and terminating both L.G.'s and J.B.'s parental rights as to H.D.M. and J.D.B. The trial court found by clear and convincing evidence that (1) L.G. had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the physical or emotional well-being of the children and (2)

3

termination of L.G.'s parental rights to H.D.M. and J.D.B. was in the children's best interest. L.G. appealed.

Evidence

Testimony of CPS Investigator

A CPS Investigator testified that the Department received an intake in October of 2016 that alleged neglectful supervision because law enforcement found methamphetamines and paraphernalia in the home of H.D.M. and J.D.B. The Investigator met with L.G. at the Polk County jail, who admitted to weekly use of methamphetamines. The Investigator also testified that L.G. tested positive for methamphetamines. According to the Investigator, none of the individuals L.G. identified as possible placements were willing to take the children.

Testimony of CPS Caseworker

A CPS Caseworker testified that he had been the children's caseworker for over a year. The Caseworker agreed that services were provided to L.G., a service plan had been developed for her that included maintaining contact with CPS, notifying the caseworker of any changes, random drug testing, a psychosocial assessment, counseling, and maintaining safe housing. The Caseworker explained that L.G. did not complete all the requirements of her service plan: she did not have an assessment, and she had some positive drug tests. According to the Caseworker,

4

L.G. had some visits with the children, but she also missed some visits and was late to others. The Caseworker testified that L.G. had inconsistent employment and was "unstable and not in a position to take the kids." The Caseworker also explained that L.G. had told him that her home was foreclosed on and she was moving, but L.G. never provided him any updated information about where she was living. According to the Caseworker, at one point, the water at L.G.'s home had been disconnected. The Caseworker explained that, due to L.G.'s struggle with drugs, arrangements had been made for an assessment for drug rehabilitation, but that L.G. could not be located for the assessment and drug test, and L.G. had told the Caseworker she wanted to try to find her "own rehab." According to the Caseworker, L.G. "didn't last long" at any of her jobs. The Caseworker also explained that the children had reported they had observed L.G. in an argument with one of her boyfriends, and that the boyfriend had kicked down a light pole at the house, although L.G. had been instructed that her boyfriend was not to come to the house while the children were there because of his history of drugs. The Caseworker testified that the damaged light pole was a safety concern. The Caseworker also testified that L.G. explained she had missed some hearings because "she was having car trouble or forgot about it[]" and she told the Caseworker that she was "'fighting an addiction and struggling to stay sober[.]'" At one point, the children informed the Caseworker that they had

5

to walk home late at night because they had to take a bath at a friend's house due to the water being off at their house. The Caseworker also testified that L.G. repeatedly complained of having issues with transportation.

The Caseworker explained that in 2014, L.G. and J.B. had voluntarily brought the children to CPS because they were unable to care for them. At that time, L.G. completed her service plan and she was able to get the two children at issue in this proceeding returned to her.[3] According to the Caseworker, during the 2014 CPS case, L.G. had issues with instability, drugs, employment, and mental health.

The Caseworker testified that after the children were removed they have been doing well with the foster parents. The Caseworker testified that L.G.'s supervised visits with her children went well, and the children love their mother and like being with her, yet he recommended termination of L.G.'s parental rights because L.G. was still unemployed, unstable, and there is no home for the children to stay in. The Caseworker agreed that the children's best interest had been endangered by "the company that [L.G.] continued to bring around the children[.]"

---

[3] An older child was not returned to L.G., but that child was not part of this proceeding.

Testimony of the School Counselor

A counselor from the children's school ("Counselor") testified that J.D.B. was in one of her social skills group. The Counselor explained that the primary issues she observed in J.D.B. were silliness and disrespect. She also observed that he had come to school "unkept and unclean" and was tardy or absent. The Counselor explained that sometimes his clothes were dirty and his clothes were "either way too big or way too small." Over the course of the school year, the Counselor observed that J.D.B.'s appearance got worse.

The Counselor explained that, upon occasion, she would receive a referral on H.D.M. for walking out of class or hiding under her desk. The Counselor explained that H.D.M. had told her there was no running water at their home, and the Counselor observed H.D.M. also to have the same "unkept and unclean" appearance as J.D.B., and that her appearance also got worse over time. The Counselor explained that she tried at one point to get clean clothes, but that H.D.M. told her she could not accept them because she would get in trouble.

According to the Counselor, she was familiar with the children from a previous school they attended and where she worked. The Counselor explained that at the previous school, J.D.B. had "a lot of aggressive behavior" including biting and pushing other students and that H.D.M. would "shut down[]" upon occasion. The

Counselor testified that J.D.B. and H.D.M. did not have issues with cleanliness at the prior school.

The Counselor agreed that the children were developmentally on target and that she did not notice any signs of abuse. The Counselor did not agree that the children were relatively happy, and she explained that H.D.M. was afraid for the school to contact L.G. The Counselor testified that she had been unable to contact L.G. about issues with the children because the phone was not connected or would not permit a caller to leave a message.

Testimony of the Assistant Principal

An assistant principal ("Principal") from the children's school testified that the children first came to her attention due to tardiness. The Principal explained that H.D.M. was tardy at least once a week. The Principal explained that she had been unable to address tardiness with L.G. because L.G.'s phone number did not work. She had also been called by teachers for assistance because H.D.M. was hiding underneath a table, leaving the classroom, or refusing to do her work. The Principal explained that H.D.M.'s clothes seemed too small, and both children "looked like they needed a bath."

8

Testimony of the Therapist

A licensed professional counselor ("Therapist") testified that L.G. had been referred to him for a psychosocial assessment and counseling. An assessment of L.G. "indicated that she may have had problems with alcohol and drugs and also possibly depression[]" but it did not result in a diagnosis. The Therapist testified that L.G.'s treatment plan included relapse prevention, parenting skills, and stress management, and that she completed her counseling with him.

The Therapist agreed that he had sent CPS a report concerning L.G. and agreed that he had described L.G.'s interpersonal style as warm and friendly. The Therapist also testified that L.G. had been cooperative and appeared motivated to work her treatment plan. The Therapist explained that L.G. appeared to have the ability to follow through with a plan for relapse prevention and she seemed to have been following the requirements of a sobriety organization. The Therapist testified that he understood L.G. had about five months of negative drug tests and he was not informed that she had failed any drug test.

Testimony of CPS Conservatorship Supervisor

A conservatorship supervisor for CPS ("Supervisor") testified that she was involved with H.D.M. and J.D.B. in the present case as well as a prior CPS case. The Supervisor explained that initially L.G. had completed several requirements of her

9

service plan and appeared not to be using drugs, and CPS felt it would be safe to permit a monitored return of the children in July of 2017. According to the Supervisor, concerns arose shortly thereafter when the Caseworker was made aware that there was no water in the home, L.G. could not be reached, padlocks were on the doors of the home, and there were reports that the children were tardy to school. The Supervisor explained that, when she and the Caseworker went to L.G.'s home on October 16, 2017, she observed a utility pole suspended in the air. According to the Supervisor, L.G. did not have an explanation for the broken pole, but that later conversations with the children and L.G. revealed that L.G.'s "former paramour[]" S.O. had gotten mad and broken the pole and the reason that padlocks were on the doors was because S.O. had broken the locks. The Supervisor also explained that S.O.'s most recent arrest had been for possession of methamphetamine. During a subsequent visit, L.G. admitted that the water had been off "for more than a couple of weeks." The Supervisor explained that the children told her they had been told not to tell her about the water being off. The children also told the Supervisor that they had to stay the night somewhere else due to the house not having water. According to the Supervisor, she learned from the children that S.O. had been staying at the home even though L.G. had been instructed that he should not be there.

The Supervisor testified that L.G. had not maintained a phone and she used various phones to contact the Department. The Supervisor also explained that L.G. had told her caseworker that her house was being foreclosed on and that she was looking into getting an RV. According to the Supervisor, L.G. did not comply with drug testing requirements, had not notified the Department of changes to her household, and did not keep the utilities working. The Supervisor further testified that L.G. had not shown up to a visitation scheduled for December 28 and had explained it was because she was battling an addiction and she had a flat tire. The Supervisor explained that L.G. would not allow the Department to get clothing for the children and that, at some point, the Department learned that the children had not been taking their medication.

The Supervisor testified that it was in the best interest of the children to terminate L.G.'s parental rights because the children have spent a large majority of recent years with CPS involvement and foster care; L.G. did little to get the children back in her first CPS case; L.G. was deceitful and dishonest with CPS; L.G. had not complied with requested drug testing; L.G. did not make an effort to obtain a safe and stable home for the children; and L.G. has not demonstrated an ability to care for the children. The Supervisor explained that some of L.G.'s struggles are based upon economics, but that L.G.'s "drug issues" were not related to economics.

Testimony of the Court Appointed Special Advocate

The Court Appointed Special Advocate ("CASA") testified that she had been working with the children since March of 2017. The CASA explained that termination of L.G.'s parental rights would be in the children's best interest because "it would give them some stability." The CASA also explained that she believed that L.G. "presents some circumstances" that would be dangerous to the children. According to the CASA, although some of L.G.'s problems are economic in nature, the CASA also believed L.G. has created some of her economic problems, such as leaving jobs because she did not want to use her gasoline and car. The CASA testified that she had visited with the children three or four times since the monitored return had failed, and the children never told her during those visits that they wanted to go back home. According to the CASA, during those visits, the children were happier than they were before, and she explained that their performance and behavior at school had improved.

Testimony of L.G.

L.G. did not appear at trial but did testify by phone.[4] According to L.G. she knew a trial was "coming up[]" but she did not know the date of the trial because

---

[4] At the beginning of the trial, L.G.'s attorney explained that he had not been able to contact L.G. and he did not know why L.G. was not present for trial.

she was never told a date for the trial. L.G. testified that she "[v]aguely[]" recalled agreeing to a family service plan that she would "get back on [her] feet, get a home, a stable environment, a job and reliable transportation." She also recalled agreeing to a drug assessment, and she explained that she understood the Department was supposed to identify a follow-through plan, drug classes, or rehab, but that no one had ever presented her with such a plan. L.G. agreed that after the monitored return, S.O. was renting a spare room in her house and she ended up having to get a protective order on him. L.G. agreed that S.O. had become violent and that S.O. broke a utility pole and that she ordered him off her property and put padlocks on the doors. L.G. agreed that the water in her home had been turned off, but she explained that it was because previous renters had run up an extremely high bill that they had not paid. According to L.G., the home was without water for about three weeks, but the children were able to use the neighbors' water. She denied that she ever sent her children to school dirty. L.G. admitted that sometimes the children were late for school. L.G. explained that she had quit some of her jobs, and that at the time of trial she was working but she did not consider it a job because she was not on the payroll. However, she testified that the person she assisted would sometimes pay her about $300 a week in cash. L.G. denied that she was using drugs at the time of trial but she admitted she had used drugs in the past. She explained

13

that three of her phones had been stolen since her children had been removed. L.G. explained that if the children were to get sick while in her possession, she could get them to a doctor by use of a "Medicaid taxi."

L.G. believed that she could stay away from drugs and support and care for her children, and she explained that she now owned her home and had a vehicle, although the vehicle lacked a tire and current registration. L.G. described her relationship with her children as "wonderful[]" and "really close." L.G. claimed that she had given the attorneys the names of "plenty of family members" and "friends" who were willing to help her and would be willing to care for her children. L.G.'s cell phone disconnected several times during her testimony and then the trial court called her back and she continued her testimony. At some point during her testimony, the cell phone disconnected again and the trial court was unable to reach L.G. again after making several attempts.

Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence, that is, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed

14

one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2017); *see also In re J.L.*, 163 S.W.3d at 84. We will affirm a judgment if any one of the grounds is supported by legally and factually sufficient evidence and the best interest finding is also supported by legally and factually sufficient evidence. *In re C.A.C.*, No. 09-10-00477-CV, 2011 Tex. App. LEXIS 3385, at **13-14 (Tex. App.—Beaumont May 5, 2011, no pet.) (mem. op.).

In a civil case tried without a jury, a complaint regarding the sufficiency of the evidence "may be made for the first time on appeal[.]" Tex. R. App. P. 33.1(d); *see Nelson v. Najm*, 127 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("It is well settled that challenges to the sufficiency of the evidence in nonjury cases may be raised for the first time on appeal."). In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* (citing *In re J.F.C.*,

15

96 S.W.3d at 266). We "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of the witnesses. *See id.* at 109 (citing *In re J.L.*, 163 S.W.3d 79, 86-87 (Tex. 2005)).

## Best Interest of the Child

Appellant's sole issue on appeal challenges the sufficiency of the evidence supporting the finding that termination of her parental rights is in the children's best interest. According to Appellant, "the case was tried on innuendo regarding Appellant's financial and economic failings[.]" Appellant argues that the children were in good health, they had never come to any physical harm in her care, and there

16

was no testimony indicating that she was not meeting the emotional and physical needs of the children.

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). Nevertheless, there is a strong presumption that the best interest of a child is served by keeping the child with his or her natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West Supp. 2017).

The Family Code outlines a number of factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child. *Id.* § 263.307(b). There are several factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the

17

stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In the Interest of A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

The best interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, in light of the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in H.D.M.'s and J.D.B.'s best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

Illegal drug use and drug-related criminal activity of the parents or caregivers may support a conclusion that the child's surroundings endanger the child's physical

18

or emotional well-being. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) (citing *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied)). Likewise, a parent's drug use as well as the inability to provide a safe or stable home may be considered in determining parental ability. *See In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, & 01-17-00484-CV, 2017 Tex. App. LEXIS 11930, at \*\*60-61 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.). While poverty should not be a basis for termination of parental rights, a parent's inability to provide basic utilities in the family home may constitute evidence of endangerment of the children's well-being. *See Doria v. Tex. Dep't of Human Res.*, 747 S.W.2d 953, 958 (Tex. App.—Corpus Christi 1988, no writ) (explaining that a parent who left her children at a home without electricity, water, or heat was "compelling evidence" of child endangerment). In addition, evidence of a parent's inability to maintain stable employment may support a conclusion that termination is in the children's best interest. *See In re A.A.B.*, Nos. 14-16-00855-CV & 14-16-00918-CV, 2017 Tex. App. LEXIS 3131, at \*\*23-24 (Tex. App.—Houston [14th Dist.] Apr. 11, 2017, pet. denied) (mem. op.).

In this case, Appellant does not challenge the trial court's statutory finding that L.G. had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the physical or emotional well-being of the

children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E) (West Supp. 2017). Evidence that proves one or more statutory grounds for termination may also constitute evidence that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (citing *Holley*, 544 S.W.2d at 370; *Wiley v. Spratlan*, 543 S.W.2d 349, 351 (Tex. 1976)); *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied) (citing *In re C.J.F.*, 134 S.W.3d 343, 354 (Tex. App.—Amarillo 2003, no pet.).

The testimony at trial provided evidence that L.G. had longstanding issues with illegal drug use, she had failed to complete required drug testing and assessment, and she had exhibited a pattern of unstable employment and unreliable transportation. School personnel testified that the children were often absent or tardy, were "unkept and unclean," and had behavioral issues in the classroom. Representatives of both the children's school and the Department were repeatedly unable to reach L.G. due to her failure to provide accurate phone numbers or to maintain a working phone. L.G. kept a friend or boarder in the family home, despite instructions from the Department not to do so, who had a history with drugs, became aggressive and violent, and who kicked down a utility pole. L.G.'s home had periods where the water was disconnected, and the children were sent to neighbors' homes

at night for baths. Some testimony suggested that the children were not properly receiving prescribed medications.

Given L.G.'s failure to provide a safe and stable environment for the children and to ensure they were clean and cared for, together with her lack of parenting skills, and her failure to complete the requirements of her plan, among other things, the trial court was presented with clear and convincing evidence that termination of L.G.'s parental rights was in H.D.M.'s and J.D.B.'s best interest. *See, e.g.*, *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A parent's inability to provide adequate care for her children, unstable lifestyle, . . . lack of parenting skills, and poor judgment may be considered when looking at the children's best interest."); *see also In re J.F.C.*, 96 S.W.3d at 266; *Toliver v. Tex. Dep't of Family and Protective Servs.*, 217 S.W.3d 85, 102 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Viewing the record as a whole, and having considered the *Holley* factors and the evidence the trial court had before it, we conclude the trial court's best-interest finding is supported by legally and factually sufficient evidence. *See In re C.A.C.*, 2011 Tex. App. LEXIS 3385, at **13-14. We overrule her issue on appeal, and we affirm the trial court's final order.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on April 23, 2018
Opinion Delivered June 14, 2018

Before Kreger, Horton, and Johnson, JJ.